number 07-1048, Mr. Schweitzer, and Ms. Wotok. Take your time, no problem. Good morning, Your Honors. Brett Schweitzer of the Federal Defender's Office, here representing Appellant Marvin Goldberg. I have requested two minutes for rebuttal, if I may. That's fine. Thank you. Your Honors, as Your Honors are perfectly aware, this case raises a number of important issues. However, probably of most immediate and practical consequence to Mr. Goldberg are the sentencing issues, because he's already served 18 months, essentially almost 18 months, on a guidelines range that should have probably been zero to six months in this case. So unless the Court directs otherwise, I'd like to start with the sentencing issues, and particularly with loss. That's fine. Thank you. I guess you might as well start with 2B1.1 then. Of course, Your Honor. It's crystal clear what happened below here, and that is that no one could identify a loss in this case. And so everyone looked to gain, the probation officer, the district court, even the government, looked to gain and said, well, we haven't been able to identify a loss, so we're going to look at the profits of the enterprise over the entire course of its operation. That is legally wrong, and most recently this Court has discussed that in Leahy, because Dickler requires an actual loss, it requires an unquantifiable loss, and it requires an articulation of how gain is closely related to loss before gain can be used as an estimate thereof. So that's perfectly clear law on the circuit, and that's not what happened below. The question we're now presented with is, is there any way to prop up the loss finding? And what the government on appeal, and what the government has argued is Application Note 3FV, which is, as we argue in our brief, by its terms, not applicable here. There are two, as the Court is aware, there are two provisions under the Application Note that are potentially implicated here, and that's first with respect to goods falsely represented as FDA approved. What are we talking about here? We're talking about nutritional supplements. We're talking about snake oil cases, things that are not FDA approved that someone might go out and say, hey, this is an FDA approved product. You should buy it. That's prong two. Prong three under the Application Note is goods requiring FDA approval that don't have it or have it by virtue of some fraud in the approval process. Well, isn't the actual language government agency?  It could, Your Honor. Here with respect to the FDA, the drugs, the approval of the drugs, I think the focus would be on the FDA approval. Now, with respect to the prong three, what are we talking about there? This is the most recent case, just a few months ago out of the Seventh Circuit, is Caputo. This is a situation where you have a medical device, a sterilizer for surgical equipment, that required FDA approval, the manufacturer simply didn't get it. So when you have a situation where you have a fraud, you have a misrepresentation scheme involving that sort of a situation, a gross receipts rule of the Application Note could apply. Neither of those situations is here, is satisfied here. He was convicted of selling in effect misbranding, among other things. That's correct, Your Honor. So if you're selling something that you're not supposed to be selling, why not just take the gross amount? Because once, unless there's some, Dickler applies a very fair, sensible rule, which is when value travels both ways in a fraud transaction, the court needs to look at and offset value that's passed to the victim. That's the law. Now, the question is, can we carve a case out where we have a gross receipts rule under Note 3F? And what the Sentencing Commission did is when it looked at the developing case law, it looked at how loss was being interpreted in this area, it carved out several certain, as the Application Note says, certain cases that present particular risk of harm. And what are those? FDA approval in this context. Approval of a drug that's not approved. Counsel, the allegation here is that the drugs are misbranded. Misbranded drugs need regulatory approval, and you didn't have it. No, well, there is an allegation of misbranding. The misbranding is selling. You're quite convicted of it. No, that's absolutely correct, Your Honor. We're not disputing that. The misbranding, though, is the selling of FDA-approved drugs without a prescription. Right. There's no adulteration here. There's no withholding of labels, changing of labels, anything else. So misbranding can be a lot of things. What we have here in this particular case were misbranded drugs that were FDA-approved, unaltered, and packaged with complete packaging that were sold without a prescription. Now, that's not a situation where you have a drug that's not FDA-approved. You have illegality, for sure. That's why there's misbranding. But the Application Note, again, doesn't apply to all misbranding cases. It doesn't even apply to every conceivable case that poses a safety risk to customers. That's essentially what the government's arguing. Don't you need regulatory approval by the FDA to distribute a misbranded drug? Well, you would never get – it's illegal to distribute a misbranded drug. However, the guideline talks about goods being misbranded. The goods being unapproved. The goods here are the drugs. The goods were approved. There's just no question about that. Were the goods misbranded by virtue of not having a prescription? Again, no question. Those are the guilty counts. Now, we have an argument about intent to defraud and whether it's a felony or a misdemeanor. But, again, it's misbranding. So we're bound by the terms of the Application Note. And the Application Note makes perfectly clear under any rule of statutory interpretation or construction that there are a limited number of cases in which this – essentially this hammer of a rule in terms of loss. We're going from a Dickler analysis to a gross receipts rule. It involved a tenfold increase in the punishment here in this case. There are very limited circumstances in which that special rule will apply. And they're simply not here. Also, if you'd address the two-level enhancement, if you would. Of course, Your Honor. The violation of the administrative order requires – and this is the case – the cases are unanimous with respect to this. And this is a small universe. There are eight or ten cases interpreting this enhancement. It has three requirements. First, that there's a binding order. Second, that it's violated. And third, there's some minimal formality required in terms of how the order was issued and the involvement of the defendant. Those three requirements quickly funnel this case down to the Kentucky Cease and Desist Order. That is the only order, the only document, letter, anything else, notice, warning received by Mr. Goldberg that told him to do something that he then violated. Was it a cease and desist order or a warning? The Kentucky letter was a cease and desist letter that said stop doing this. And that's what sets it apart from everything else in this case. The FDA notice, the oral warnings, the inspection, the Section 305 notice, all of those other things that the government is relying on with respect to that enhancement fail the binding order requirement. But there's evidence that he violated the cease and desist order, right? He did continue to do, at least in some respect, do business in Kentucky. That's true, Your Honor. We're not disputing that. So on the Kentucky order, this case really boils down to, implicates the third requirement, which is formality. And what we have with this Kentucky order is an act. Is it an order or a letter? It's an order. You're done. Well, we're not done, Your Honor, if I respectfully disagree with that. But let me, I'll be a little bit clearer in terms of my terminology. It was a cease and desist letter that told Mr. Goldberg to stop selling drugs into Kentucky. Note 8C says, provides an enhancement if the defendant commits a fraud in contravention of a prior judicial official, I'm sorry, prior official judicial or administrative warning in the form of an order, injunction, decree, or process. That's correct, Your Honor. That's the language. And with respect to the cease and desist letter, the primary problem with that is the formality requirement. If it indeed is an order, and perhaps there's a question as to the form. Is it a letter? Is it an order? We would concede here that at least it told Mr. Goldberg to do something, unlike anything else in the case. And so to that extent at least, it was a cease and desist letter. Now, but with formality, that's where this Kentucky letter runs into big problems. But you argue that it's a letter from an official entity, right? Correct. That was telling you to cease doing what you were doing. And it was in the form of, we're talking about whether it's an order, but at the very least wasn't in the form of the process used by the Commonwealth of Kentucky? Well, when we get to process, the problem is, and this makes a lot of sense, every court to look at this has said these bald letters, even if they're in the form of an order or telling the defendant that he has to stop something, which is what happened here. Even those letters, there needs to be some sort of formal process, either an adversarial hearing at which the defendant had an opportunity to challenge, to make factual presentations. He wrote to Kentucky? Or how did they find out that he was doing this? Apparently, it's not perfectly clear from the record, but the letter itself says that a veterinarian in Kentucky forwarded some materials, presumably some marketing materials or something, to the Kentucky board. So this wasn't some entity that he had told, like Pennsylvania, that I'm doing this, and they wrote right back saying, better not. What happened in Kentucky was he gets this letter out of the blue. He actually does respond, and he never hears back. He gets the letter. And that's an important point that I would like to just stress, if I may, Your Honors. Mr. Goldberg did not, whatever one might think of how prudent he acted in the face of these several warnings that he's gotten, Mr. Goldberg responded to every single warning by every regulator, state, federal. And what happened in Kentucky is that he responded and gets nothing back. Couldn't he have, if he had had a licensed veterinarian on his payroll, and the licensed veterinarian talked to each of the horse owners and discussed it with the horse owner as to why the horse owner. Now, I can understand, as I understand it, people who have horses sort of a little more freewheeling, maybe, than people are for themselves. They think, well, the horse needs this. But if he discussed it with the horse owner or the trainer, and the veterinarian said, yeah, that would be good, and the trainer, the veterinarian had then written the prescription and handed it to Goldberg, they could have filled it legally? Yes, Your Honor. And, in fact, that's what happened on the distribution counts. People go in and see a doctor, for example, and they think, you know, I need a particular drug. The doctor can examine them, and it's a legitimate transaction. The person's read something on television. Boy, when you're my age, you know, you can't believe the number of things. The 630 news, that's all there is. Even my age, Your Honor. I mean, the whole thing is medicines. So you see something, you figure, well, that'd be good. So you ask your doctor. Your doctor says, yeah, and writes a prescription. Well, that's a legal thing. I mean, because the doctor decides it. Couldn't you do that with a horse? Indeed, you could, Your Honor. And that precisely gets us to another issue. But that's actually what happened in the distribution counts with respect to, you know, the confrontation clause issue that we raised in point one and the jury instruction issue, too. So that was evidentiary. The evidence showed that that's what happened with the distribution counts, and that's why there's not harmless error with respect to the confrontation clause violation. I see my time is up. I have one more question. Back to the two-level enhancement. It seems that since Linville, the case you cited in your brief, the commentary has changed. I think application note 7C since 2006 says, refers to administrative warnings not to take a specified action. Is that so, and how does that apply here? It is the exact language of the note is the violation of any prior specific judicial administrative order, injunction, decree, or process not addressed elsewhere in the guidelines. That's the current version of 7C. And so that doesn't leave any room for a non-binding order to trigger the enhancement. And no court has held that otherwise. In fact, May law is the case that's square on this case where we had a situation of, that was a DOT case, but we had notice of charge sheet from the federal agency, just like the notice of claim here. We had response, potential hearing. And what's important to note about the federal, the FDA process here was this was midstream. This was, there was a warning. There's no doubt. There was a charge of illegality, no doubt. Then things went criminal and the agency made no adjudication, no order, no adjudication, just like May law. Thank you, Your Honor. Thank you. Ms. Dorothy. Good morning. May it please the court, Katherine Votaw from the Philadelphia U.S. Attorney's Office. If we can just maybe pick up where Mr. Schweitzer left off. On the two-level enhancement for disregarding the warnings, when you look at Linville, it looks as if that's an enhancement for aggravated criminal intent. In other words, you're told you're under an order not to do something and you just disregard it. So there's a penalty for that. Here he has, he's given a letter from Kentucky officials telling him that they've gotten information that he may be selling, other than through a vet or selling in effect what was later determined to be misbranded items, legally misbranded, and telling him to stop. But is that formal enough? Your Honor, the short answer to that is yes, it is. It is a cease and desist order. It has the word cease and desist in it. Is it an order? It's an unofficial letterhead. Is it an order? Is it an order? It doesn't say order on it, but it says cease and desist. You know, I wondered about that because, you know, usually there's a statute. The statute says that the agency may issue orders. But what was the authority of the, who was the attorney general? I believe it was the attorney general. What's the authority under Kentucky law? I was in a, you know, I don't want to think I was everywhere, but it's true, I was in the attorney general's office in New Jersey. And I don't, I never knew of any authority we had to issue orders. We could say, look, if you don't stop this, we're going to sue you or something. But what, would we have to look at Kentucky law to see if the attorney general of Kentucky could actually issue orders? I don't believe we need to look to Kentucky law, and I believe the answer to the question of what the authority is, is that the regulators of professional people have the authority within their states to issue these orders. But I don't have a citation for you. I'm happy to supply it. But I think the legal issue needs to be framed a little more broadly. The legal issue before the court is, is Linville the law in this circuit, or are the other circuits better interpreting this enhancement? And I submit that the other circuits that apply a more flexible standard that goes to the point, which is, is there aggravated criminal intent, apply the proper standard. The negotiations and agreements that are cited in Spencer, Flanders, and Mantis, are clearly not the type of adversary proceedings that Linville envisioned. In Mantis, I believe there was a red tag on a refrigerator telling them not to sell the contents, and that was deemed the order, and the inspection was deemed the process. Here, given that, if my view of the law is correct, and that it is a somewhat more flexible standard than adversary proceedings before an administrative agency, then the district court was clearly correct in finding, as he did, that this aggravated enhancement applied. This man was warned by the FDA on the phone, by letter, and in person more than once. The inspectors told him. Dr. Pellegrini was told. He was told by Karen Campbell on the phone. And the two written warnings, well, the one warning and the other notice. Can I follow up on a question I asked your adversary? They amended the application note to say administrative warnings. Is that a red herring here, or is that helpful for your argument? It is helpful, Your Honor. Thank you. Because these are exactly the warnings that he was given. And as the judge found below, you say your client is an educated man. How come he didn't know he should stop? Does he have to have the word desist told to him to understand that he needs to stop? And obviously the court felt, no, he doesn't. So the enhancement squarely applies, and this is a remarkable record of interaction with regulatory agencies from several states and the federal government and complete defiance of all the rules that were very clearly told to him. And it's not okay just to write back, because this is a defendant who doesn't hear. He doesn't listen. He gets a letter, and he does this, because they squarely explain to him in no uncertain terms what the requirements are, and he just writes back, I disagree. I don't think so. I think animal owners can be veterinarians. So it squarely applies. Why don't you address, if you would, even the eight times more enhancement, the 16-level enhancement for the calculation of losses? Yes, Your Honor. The government has two points with respect to loss. One is there was a loss, and the district court found it. Second of all. What was the loss? The government articulated losses to customers and to the government. What's the loss to customers? The loss to the customers is a couple of things. One is these are contraband. Articles sold in this fashion without the regulatory approval through the chain are contraband and can be seized, and I cite 21 U.S.C. 334. But nothing was seized here. We have no evidence of seizure, Your Honor, although I know in other cases the FDA has seized perfectly approved drugs. But so far nothing was seized. Correct. In other words, that would be a loss to the customer, but no customer in that instance appears to have suffered a loss. That's correct, Your Honor, except that what the customers bargained for was a package of things. Sure, they wanted the goods, and they got the goods, but they also were promised a couple of things that they didn't get. One is implicitly that no government agency was going to come in and take their stuff away. In other words, that it wouldn't be contraband. But no one did. No one did, that's true. But it's part of the package for what they bargained for and didn't get. More importantly, what they didn't get was the veterinary consultation and the availability of that. And if I could give you an example of why that is important, and I'll use a regular family situation. You take your kid to the doctor. He's got a bad cough. The doctor gives you medicine. That's perfectly okay. When you get home and administer that medicine to the kid, there may be questions you want to ask the doctor. Do we have any indication that any horse to whom the medicines were administered suffered as a consequence? We have no evidence, and as the judge found, fortunately no horses were killed. But the availability of the veterinarian on call to find out, can I give him more stuff if he's not getting better? He's getting worse. Now he has new symptoms. Now he's running a fever. These are all questions you want to ask. That all sounds hypothetical. What's your evidence of actual losses? My evidence of actual losses, Your Honor, for the customers are this package of rights and goods that they did not get the full value of. Well, I maybe have the wrong notion, but I always thought of horse owners as sort of an independent type that maybe would like to make their own decisions. They might, Your Honor. And my children complain to me that I think I'm a doctor. I like to make my own decisions, too. The point is that, as Dr. Pellegrini said, you have no idea who these customers are. Everyone is assuming that these are horse owners that know what they're doing, like Mark Goldberg claims that he is. But you have no idea. There's nothing in the record that shows. And Dr. Pellegrini himself said, I would be guessing as to who these customers are, and so would anybody else. Because it's a fax business. And who knows in these stables whether there are kids hanging around, and kids want to get their hands on these drugs and maybe sell them on the street. They were probably buying this stuff because they could get it cheaper, I guess, than going to a vet. I'm sure they were, Your Honor. And I will even stipulate that the bulk of the customers were indeed horse owners and that many of them may, in fact, have been experienced. So rather than having a loss in one sense, maybe they got an advantage. I don't know. It's like, for example, if you had some whiskey that you stole and you sold it, and it really was what it said it was, the guy you sell it to for less than the market value didn't really have a loss. I mean, he had net gain. I understand that the customers, if all they wanted was the drugs, got the drugs and paid for them, and they paid less than they would have for a vet, and that was the niche that this defendant tried to cram his market into. But another victim of this crime is the FDA. And it is true, as the defendant points out, that the costs of investigation do not count in loss. However, the FDA and the state regulators expended dollars trying to get this man to comply. I thought the court said that there were $1.1 million worth of losses, and what the court was looking at was the gross profits of Mr. Goldberg. Yes. What the court found is there is a loss. Gain is an appropriate substitution, therefore the 16-level enhancement. And in doing so, he … Gain is a substitution for the loss. Yes. He found it was appropriate. He started this off by saying there were two aspects. Yes. That's the second aspect. Well, the second aspect of how you find a loss is through the application note, the special application note that we believe applies here. It says where goods are falsely represented as approved by a regulator or goods for which regulatory approval is needed but not obtained or obtained by fraud. And the whole point of this is to protect public health, safety, and confidence. This application note would apply to situations that are not as intensely regulated as the FDA situation. This is a completely regulated environment from raw materials all the way to the mouth of the consumer. Excuse me. Are you saying this, that note 3FV does not apply to this case? I'm saying it absolutely does apply. Okay. Is it 3FV or 2FV? I believe it's 3FV. Okay. So how does your case fit in there exactly? Here's how it fits in. It fits in because it's clearly intended to fit in because of the regulatory context that we're dealing with. But more specifically in the language, it is not the goods themselves that are at issue. If they were just sitting on a shelf, what matters is the distribution of the goods to the hands of the consumer. That's what everyone cares about. That's what the crime is. So if goods are falsely represented as approved, in fact, what that means is that the distribution of those goods should not be falsely represented as approved. Similarly, goods for which regulatory approval was obtained by fraud, here, goods whose distribution was required to have regulatory approval that was either obtained by fraud or didn't exist. And those are precisely what happened here, and that's what the court found. So per se, because they didn't have DEA or FDA approval to distribute these, even though the drugs themselves were fine, it fits within this application, though? Yes, Your Honor. And it needs to in part because of other situations. For example, there are other things that are regulated, obviously, by the federal government. And some of them are just meat products themselves. So if your stamp on your meat product is bad, that's bad. But this is an entire distribution chain that is regulated by the FDA. And as the court found, why is it such a leap to say that your client didn't hold himself out to that degree when he held himself out to have a business that in part and parcel of a licensed veterinarian giving these drugs to clients? So I submit that the court was appropriately finding a loss and substituting gain as the measure. If I could turn to the possession with intent to distribute for a moment. I don't think I have any questions on it, but go ahead. All right. My point is simply that there are two things that one has to remember in reviewing this. One is that we should base this on what was before the jury and not what the government may have argued later. And second of all, that the hearsay statements were very limited. Contrary to what the defense claims, there is no evidence, none in this record, that a valid prescription was phoned in by Dr. Wilkes to the pet health people. What is in the record is that Dr. Wilkes had a phone call, one phone call, with Mark Goldberg and his brother in which Mark Goldberg says, he prescribed me controlled substances. Even Mr. Pet Health himself doesn't say, I got a prescription. He says, I got a DEA number. There is absolutely no evidence on top of this mountain of evidence of an illegal pharmacy operation that this was a proper prescription. Thank you. Thank you. Thank you. Thank you again, Your Honors. On the 16 level matter, the note or comment that was quoted to us by Ms. Votaw appears to be right on point. And also, isn't there a Seventh Circuit case called Butante from 2001, B-H-U-T-A-N-T-I, that seems to cut against you with regard to how one calculates in this type of situation the loss where it's so difficult to find out what the profits were. I don't think so, Your Honor, for two reasons. As to the first part, I'll address Butante in just a second. The first part, the terms of the application note applying, you know, questions about safety. This application note could be written to say, if a regulatory rule is violated, then gross receipts is the rule. It could be written to say, if there is any contravention of a regulation, gross receipts rule. It's not. It says, goods for which regulatory approval by a government agency was required but not obtained, skips over, loss shall include the amount paid for the property, services, or goods transferred with no credit provided for the value of those items or services. That's right. And I'd suggest that the key words that you just can't get away from there are goods approved. Now, my colleague suggests it doesn't matter. It's regulated soup to nuts. What we really care about is distribution to the, you know, the propriety of the distribution. I find it difficult to believe that no one can see a distinction between peddling goods that were supposed to be approved by the FDA that were approved by fraud or goods that you're saying are FDA approved and everything that goes along with that and that are not. Those are heightened culpability. Those are extremely serious cases, unlike any situation where any regulation post FDA approval of a drug or in another context, you know, it would depend on the agency process. But here we have a regulatory violation, which we stand convicted of. Mr. Goldberg stands convicted of. We're not bucking that. But what we have is a post approval regulatory violation, and that just doesn't fit within the language of the rule. As to Bhutani, Bhutani doesn't fit either. First of all, we should set aside the issue of whether Bhutani says anything about Note 3F, because it doesn't. I think that's pretty clear from the briefing. The question, does Bhutani on its face support us, support Mr. Goldberg or support the government? I think it clearly supports Mr. Goldberg. And that's because in Bhutani you had adulterated drugs. No question about that. And in Bhutani, the court could say that the customer did not receive the FDA approved drug. He received a counterfeit. He received an adulterated drug. It's simply not what we have here. So, in fact, Bhutani helps us. If we had that situation, then it's a different case. But here, where we have pristine, perfectly packaged, perfectly represented, FDA approved drugs, the note doesn't apply. With respect, if I may just quickly, Judge Chigares, return to your point with respect to the Kentucky order and the application note amendment. The commentary to the application note does talk about warning. But as we say in our brief, the warning, directly following that language in the amendment of the commentary, is warning in the form of, and then it tracks the language of the guideline provision. So the amended note says, administrative warning in the form of an order, injunction, decree, or process. Not to take or not. So that wouldn't apply to the FDA? It doesn't broaden it. It does not broaden the concept. It says, yes, orders are what counts. That's what's in the guideline. And this language in the application note, in fact, in the commentary, in fact, just qualifies that. It does not expand it whatsoever. If I may, just have two more seconds to address a point of contraband that the government had raised with respect to loss. Who knows is not enough under Dickler. Who knows what could have happened, what might have happened is not enough. And, in fact, with respect to this idea of, okay, even if a seizure had occurred in this case or another case, that would mean that contraband under the governance theory has no value. Well, when you look at the special note 3F6, it's small Roman. We've been saying 3FV, but 3F6, that application note says when controlled substances are at issue like cocaine or illicit drugs, you look at the street value of the drugs. It doesn't mean there's no value because they're hypothetically could be seized at some point. So the contraband argument has no play whatsoever. Nor were these individuals not getting what they paid for. If the court were to look, if the court looks at the disclaimer. I think we've already dealt with that one. It's perfectly clear that these folks got what they were looking for. Thank you. Thank you. Thank you to both counsel for very well presented arguments. Can we see both counsel just up here for just a moment, please?